## LONDON TERRACE, Inc. v. CREEDON.

### No. 337.

United States Emergency Court of Appeals.

Submitted at New York City Oct. 18, 1946.
Decided June 6, 1947.
Rehearing Denied June 30, 1947.

Maurice Finkelstein, of New York, for complainant.

Harry H. Schneider, (Richard H. Field, Carl A. Auerbach, and Phillip Travis and Betty L. Brown, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

This controversy arises from the denial of complainant's protest against a reduction of rents ordered by the Area Rent Director in January and March, 1945, which was based upon Section 5(c) (1) of the Rent Regulation for Housing in the New York Defense-Rental Area.[1] This regulation provides that a decrease of maximum rent may be made by the Administrator at any time on the ground that the rent for the housing accommodations in question is higher than the rent generally prevailing in the area for comparable housing accommodations. Following the denial of complainant's protest, the present complaint was filed in this court.

A brief statement of the controversy giving rise to the protest and these proceedings will serve to clarify the issues. Some time prior to February, 1943, a great apartment building project was developed and constructed in New York City under the name of London Terrace. As a result of financial difficulties, it was adjudicated bankrupt and thereafter reorganized under Section 77B of the National Bankruptcy Act, 11 U.S.C.A. § 207. The buildings constituting the apartment project were, at the time of the reorganization, separated into two groups. One of these groups was given the name of the London Terrace Towers; and the other, the London Terrace Gardens.

The London Terrace Towers, with which we are here concerned, is owned by London Terrace, Inc., a New York corporation. The Towers consists of the corner apartment buildings in the block bounded by Ninth and Tenth Avenues, and Twenty-third and Twenty-fourth Streets, in New York City. These four buildings are each

---

[1] 8 F.R. 13914. The Maximum Rent Date provided by the regulation is March 1, 1943. The effective date of the regulation was November 1, 1943.

18 stories high, with penthouses on the roofs; they contain a total of 700 housing units, which are arranged in 46 vertical tiers. At the time this controversy arose, 293 of the units were furnished, and 407 were unfurnished. Most of the units of are one- and two-room apartments, with kitchens or kitchenettes. The units are furnished, usually' in one of three general styles—traditional English mahogany, modern, and provincial American. Included in the buildings, for the use of the occupants of the apartments, are a swimming pool, recreation and lecture rooms, and roof, and other, terraces. One of the terraces is given over to the use of babies, their mothers and nurses; another has kindergarten maintained for older children. A grocery store, beauty parlor, barber shop, bank, and post office are located in the premises. Gas is included in the rental, and maid and telephone services are also supplied.

On March 1, 1943, the Maximum Rent Date fixed by the Rent Regulation for Housing in the New York City Defense-Rental Area, 150 housing units of the London Terrace Towers were furnished. Some of these units, however, were not rented on that date or during the two months prior thereto. Of the units unfurnished, as of March 1, 1943, many were subsequently furnished. Altogether, there were 112 apartment units in London Terrace Towers which were not rented on March 1, 1943, the date fixed in the regulation as the Maximum Rent Date, or during the two months prior thereto. These housing units were subject to the Rent Regulation for Housing in the New York City Defense-Rental Area, which, in Sections 4(c), (d), and (e), and Section 5(c) (1), provided as follows:

"Section 4. *Maximum rents.* Maximum rents (unless and until changed by the Administrator as provided in Section 5) shall be:

\* \* \* \* \* \*

"(c) *First rent after March 1, 1943, but before November 1, 1943.* For housing accommodations not rented on March 1, 1943, nor during January or February, 1943, but rented prior to November 1, 1943, the first rent for such accommodations after March

1, 1943. The Administrator may order a decrease in the maximum rent as provided in Section 5(c).

"(d) *Constructed or changed before November 1, 1943.* For \* \* \* (3) housing accommodations changed between those dates from unfurnished to fully furnished, or from fully furnished to unfurnished \* \* \* the first rent or such accommodations after \* \* \* change. The Administrator may order a decrease in the maximum rent as provided in Section 5(c).

"(e) *First rent after November 1, 1943.* For \* \* \* (4) housing accommodations changed on or after November 1, 1943 as the case may be \* \* \* The Administrator may order a \* \* \* decrease in the maximum rent as provided in Section 5(c).

"Section 5.

"(c) *Grounds for decrease of maximum rent.* The Administrator at any time, on his own initiative or on application of the tenant, may order a decrease of the maximum rent otherwise allowable, only on the grounds that:

"(1) *Rent higher than rents generally prevailing.* The maximum rent for housing accommodations under paragraph (c), (d), (e), or (g) of section 4 is higher than the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on March 1, 1943."

The 112 apartment units in question were first rented as fully furnished apartments after the Maximum Rent Date, and, therefore, their "first rents" became the maximum rents in accordance with Section 4 of the regulation above mentioned.

Acting professedly in accordance with Section 5 of the regulation, the Area Rent Director, early in 1945, by various orders, reduced the rent for the 112 apartment units above mentioned, on the ground that the rents then being received were higher than the rents generally prevailing for comparable housing accommodations on March 1, 1943.

According to the provisions of the Interpretation of the Regulation,[2] the rents cannot be reduced in such a case below the

---

[2] OPA Rent Interpretation 5(c) (1)— 200:1731–1782.
I Pike and Fischer OPA Service. pp.

higher of the following two levels: (1) The rent generally prevailing in the area for comparable accommodations on the maximum rent date; or (2) as to those units rented unfurnished on March 1, 1943, the actual rent on the Maximum Rent Date plus the difference in rental value, as of that date, by reason of the additional furnishings.

Complainant, on April 3, 1945, applied for review of these orders to the Regional Administrator, who, on June 23, 1945, increased the maximum rent of twelve units, decreased the rents of two, and affirmed the remaining orders. On August 14, 1945, complainant filed a protest on the ground that the Regional Administrator was without authority to decrease the rents of the units in question because they were within the range of rents of comparable units on the Maximum Rent Date. He also contended that the Regional Administrator improperly restricted consideration of comparables to the same tiers of the apartment buildings as the subject units;. that he also, arbitrarily selected a tier for comparison, and disregarded the increase of rental value made by the addition of furnishings in the subject apartments.

In passing upon complainant's protest and in arriving at the determination of rents for the subject apartments in line with the rents generally prevailing for comparable accommodations on March 1, 1943, the Administrator used two methods, consonant with the Interpretation of the Regulation already mentioned, in order to establish maximum rents at the higher of the two specified levels: The first was to select housing accommodations comparable to the units for which it was sought to fix the rents. The housing accommodations which the rent inspectors used as comparable to the subject units were selected from among the units in the London Terrace Towers and also from among the units in the adjacent London Terrace Gardens. In making their comparisons, the rent inspectors classified the subject apartments in six different groups, according to the style of furniture used, and the number of rooms. These apartments were then compared—without regard to furnishings, to other apartments in the same, or different vertical tiers of the building. Of the 110 subject units, 42 were compared to other units in the same vertical tier; 64 were compared to units in different vertical tiers, and 2 had no comparables. Of the 42 compared to units in the same vertical tier, seven were compared to units considered out of line by the inspectors. Of the 64 apartments compared to units in different tiers, 37 were compared to apartments having different exposures. No standard allowances were made for differences in rent due to elevation and varying quantity and quality of furnishings. The other set of comparables were taken from the adjacent Garden units. Thirty-five of these apartments were considered representative by the inspectors.

The second method of establishing rents, in accordance with the above mentioned Interpretation, was to add to the rental value of the subject apartments which were rented unfurnished on the maximum rent date and were thereafter rented furnished, the rental value of the furnishings. On the basis of their studies the inspectors concluded that the difference in rental value of the furnished and unfurnished apartments was $20 per month for a one-room apartment with a kitchen or kitchenette, and $30 per month for a two-room apartment with a kitchen or kitchenette.

Adopting the above methods of arriving at the determination of maximum rents to be fixed for the apartments concerning which complainant had filed its protest, the Administrator, by order dated April 26, 1946, granted the protest in respect to two units; and allowed it in part as to 23 units; but denied the protest as to the remaining units. This leaves 110 units as to which complainant's protest was denied in whole or in part. These units consisted of 74 one-room apartments, 35 two-room apartments, with kitchens or kitchenettes, and one five-room apartment; and these are the units which are the subject matter of the present controversy. Upon the entry of the Administrator's orders, the present complaint was filed.

Complainant here contends that the Administrator's determination as to the rental values of accommodations comparable to the subject apartments on the Maximum Rent Date was not sustained by the evi-

dence; that the Administrator's determination of the rental value of the furniture was arbitrary and contrary to law; and that the Administrator had no power to reduce the first rents, inasmuch as such rents were not above the level of those generally prevailing for comparable accommodations on the Maximum Rent Date but were within the range of such rents.

In determining what accommodations were comparable to those in question, as of the date on which maximum rents were established, the Administrator relied upon the affidavits and statements of the Area Rent Inspectors. The inspectors, in arriving at their conclusions, inspected and considered 124 apartment units in the four subject building which had been rented furnished on the Maximum Rent Date. The total of all units that had been rented furnished, as of that date, was 150—so that the great majority of all furnished units was considered by the inspectors in their "comparability" studies and recommendations. These studies and comparisons disclose that the inspectors considered each of the apartment units in question and compared each one to what they considered was the most nearly comparable unit which had been rented furnished on the Maximum Rent Date. In certain cases, the inspectors felt that there was not a sufficient number of units that had been furnished on the Maximum Rent Date in the same tier to be representtative of the prevailing rents for that type of accommodation, as of the Maximum Rent Date, and, accordingly, took into consideration data for apartment units from a different tier of the particular building which, in the opinion of the inspectors, was the tier most closely similar to that in which the units in question were located. In such cases, the inspectors made what they believed were appropriate adjustments for differences in the tier and location of the apartment units so used as comparable to the subject units, and in their report, set forth their expert opinion as to the rents generally prevailing in the area on the Maximum Rent Date for the accommodation which they found was comparable to each apartment unit.

The inspectors found, as appears clearly reasonable, that apartment units in the same tier tended to differ less from each other than they differed from other units in other tiers. On different floors, apartments in the same tier required usually only one type of adjustment—for elevation. Moreover, when the inspectors found that two or less comparable units had been rented furnished in a given tier on the Maximum Rent Date, they took into consideration also, the maximum rents for the most closely similar units in other tiers in the same building, making required adjustments for such factors as elevation, area, layout, and exposure. Generally speaking, in apartment buildings, the only units that may be said to be identical are those in the same tier, for apartment units in other tiers vary in many tangible and intangible respects. In fact, the evidence adduced on behalf of complainant in this case is to the effect that different rentals are properly chargeable for units on the same floors, but in different tiers, although such units, except for their location in different tiers, might otherwise be deemed identical.

 Complaints that the inspectors considered an insufficient number of comparable apartment units in arriving at their determinations go to the weight of the evidence rather than the validity. No facts appear that would warrant conclusions that the consideration of additional comparables, or that a different treatment, would result in different conclusions or the establishment of different rentals. In spite of objections that the Administrator too narrowly restricted the number of comparables used in reaching his conclusions, there is no indication on the part of complainant as to what specific comparables should have been considered. It could scarcely be contended that all of the units in the buildings should be considered. For, in such a case, too many complicated adjustments would be required in order to take into account all of the many differences affecting rental value which would in the end rest almost exclusively upon expert opinion. All determinations of the comparability of apartment units involve some degree of judgment as to how many comparables are to be used. The decision as to when a representative number of comparables have been considered is also a matter of judgment;

and there is no evidence in this case that there was any abuse of such discretion or that there was not a sound exercise of judgment in this regard. We find, in the determinations of the inspectors and the Administrator, based upon the foregoing evidence, nothing of an arbitrary or capricious nature. Contentions of complainant that the methods used by the rent inspectors were followed only when the comparables used produced a result of low rental, but abandoned when it would result in a higher rental, are contrary to the evidence in the record. It is our conclusion that the Administrator's determinations of comparability were founded upon responsible, unbiased, expert opinion, having a reasonable basis in fact.

Having disposed of the issue raised on the subject of comparability, we come to the contentions of complainant on the issue of rental value. Both respondent and complainant agree that a single amount should be attributed for the rental value of the furniture and furnishings in all the one-room units and a single amount should also be attributed therefor in all the two-room units. The only controversy is concerned with the amount so attributable. Complainant contends that the sum of $24 should be added for the furnishings of the one-room units, and $38, for the units of two rooms. The Administrator found that $20 was proper for one-room, and $30, for two-room units.

The way in which complainant arrived at its figures is as follows: It took the average of all the rents for furnished one-room apartments as of the Maximum Rent Date and subtracted therefrom the average rent, as of the Maximum Rent Date, for all unfurnished one-room units. It followed the same technique for the two-room units. It is claimed that the difference is the amount that should be attributed for the addition of furniture and furnishings to such apartment units. But this method may well distort the actual facts, for there was an unequal distribution of furnished and unfurnished units which were rented in each tier of the various tiers of each building as of the Maximum Rent Date. Further, it appears that the "shelter" or unfurnished rents vary considerably from tier to tier;

and it is apparent that if some of the tiers without furnished units, which were rented on the Maximum Rent Date, had a relatively lower shelter rent, and if other tiers with higher shelter rents contained the furnished units, the difference in the average of all the unfurnished and furnished maximum rents would include sums attributable to the variation in the amounts for shelter rents as well as for the addition of furniture. Moreover, it appears from the evidence that shelter rents, in each tier, increase in accordance with the elevation of the respective units. It would, therefore, result that if the furnished units which were rented on the Maximum Rent Date were for the most part, located on the upper floors of the different buildings, and the unfurnished, on the lower floors, the average of the rents would not give a result from which differences in rental value could be properly obtained.

On the other hand, the inspectors, by comparing maximum unfurnished and furnished rentals for units in the same tier, found a constant $20 differential for the furnished one-room units and a $30 differential for the two-room units. The units on which the Administrator and inspectors expressly based their determinations in this regard were the London Garden Apartments, of which 107 units were inspected. It is insisted by complainant that these comparables were not in the "subject buildings"—that is to say, that they were not units in London Towers, but rather units in the London Garden Apartments. However, this fact does not vitiate the Administrator's conclusions. The Gardens and Towers appear from the record to have been merely different parts of the same group of buildings. Prior to February, 1943, the management was the same. In advertising London Terrace, the management had previously used photographs of the Garden and Terrace Apartments interchangeably. The furnishings in all but a few apartments in all of the buildings had been selected and installed by the same management. The furniture of the comparable London Garden units is of the same type, of the same quality, and quantity as that placed in the subject apartments of London Towers, and was purchased from

the same source. In fact, the furnishings were identical, unit for unit. London Gardens had continued the established policy of charging $20 per month for the furnishings of a living room and kitchen, and $30 per month for the furnishings of a living room, bedroom, and kitchen, which was a policy that had begun when the Garden and Tower buildings were under the same management. If there had been no change of management in the single group of all of the buildings including London Gardens and London Towers, at the time of the bankruptcy proceedings, there could hardly be even a technical objection raised at this time that all of the units in London Towers were not in the same subject buildings as those of London Gardens. In any event, we are here concerned with the rentals of the units, as of the Maximum Rent Date. And on the Maximum Rent Date, all of the units in London Towers and London Gardens were in the same "subject buildings." Moreover, an examination of the record discloses that the inspectors' conclusions in rental value did not ignore the London Towers units. According to the evidence, all of the furnished and unfurnished units relied upon in London Gardens were comparable to the subject units in London Towers. Complainant attacks the comparisons made by the rent inspectors between the rents for furnished and unfurnished units in London Gardens on the ground that the record does not disclose what adjustments may have been made with reference to those units. None of the conclusions as to the rental values of any of these units was challenged, and, accordingly, we do not consider that these findings of rental values are in any wise vitiated.

In an attack on the reliability of the rent inspectors, complainant remarked that, in one place, they described a certain type of furniture as "refinished second-hand furniture," "questionable as to artistic merit," "doubtful as to utility," "poor quality and construction," with "inferior finish," "unsteady chairs," and concluded that "in the opinion of the inspectors, these apartments are not so desirable or so comfortable as those of the other two groups, because in general, the furniture is in poor condition, of inferior quality, and they appear to be assembled heterogeneously." Complainant then charges that in spite of the foregoing description of the furniture, the inspectors finally stated that the furniture in all the apartments of all groups in such buildings was "identical in quality and quantity" to the furniture of the subject units, and that they assigned a single rental value, irrespective of the type of furniture. It is declared that these conclusions of the inspectors are obviously contradictory and that the furniture of the "other two groups" could not, by their own statements, be identical in quality to the inferior furniture. However, an examination of the record discloses that the statements of the inspectors that the furnishings were identical, meant that the furnishings in each subject unit were identical in quality and quantity to the furnishings in each unit comparable thereto, which was rented furnished on March 1, 1943, the maximum rent date. We are clearly of the opinion that the Administrator's conclusions in the foregoing were sustained by substantial evidence.

The final contention to be considered is the claim made by complainant that the Administrator was without power to reduce the "first rents" of the subject apartments. It is maintained that such "first rents" were not above the "range" of rentals for comparable accommodations on the date on which maximum rents were established; and it is declared that, by the Administrator's own prior decisions, the term, "generally prevailing" rent for comparable accommodations, in the Regulation, denotes not any particular single figure, but the "entire range of rentals" existing on the Maximum Rent Date for comparable accommodations. Consonant with the foregoing claim, complainant, therefore calculated the "range" of rents prevailing throughout the subject buildings on the Maximum Rent Date, and found that the one-room apartments "ranged" between a low rental of $74, and a high rental of $110 per month. The range for two-room apartments was between $97 and $147 per month; and for three-room apartments with a terrace, between $190 and $270 per month. Accordingly, complainant insists that any "first rents" which it collected for these apartment units, which fell between the low and

high rents of the "range" cannot be reduced. For complainant claims that, since its first rents fell between the range of the high and low rents that prevailed for comparable accommodations on the Maximum Rent Date, such first rents were not in excess of the rents generally prevailing for comparable accommodations and, under the Regulation, cannot, therefore, be reduced by the Administrator.

Here, then, we have rentals for one-room apartments with a variation of nearly 50% in rentals for comparable units; and rentals for two-room apartments with differences of more than 50% for comparable units which were rented on the Maximum Rent Date. For purposes of our consideration, there might well have been differences of 100%—or more, between the comparable units rented on the Maximum Rent Date.

It would be astonishing to find that the Regulation or administrative decisions provided that, in ascertaining what rent was generally prevailing for comparable accommodations on the Maximum Rent Date, the Administrator was obliged to select a given rental simply because it fell within a range of rentals for comparable accommodations on the Maximum Rent Date, although such rental so selected by the Administrator might be 100% greater than other rentals for such comparable accommodations.

The Regulation provides that an adjustment of a first rent shall be made on a basis of the "rent which the Administrator finds was generally prevailing in the Defense-Rental Area for comparable housing accommodations on March 1, 1943." Comparable housing accommodations within the intendment of the Regulation are accommodations which are sufficiently similar to the subject accommodations to be regarded by an expert as of substantially equal rental value. Siranni v. Bowles, Em. App. 1945, 148 F.2d 343. Where differences in the rents for comparable accommodations are the result of differences in rental value, it would certainly be completely subversive of the objectives of rent control to permit the rents for such units to be fixed no lower than the top of such a range, without regard to the differences affecting the

rental value; and, in this case, the evidence discloses that the varying rents for comparable units resulted from differences in the rental value of the units due to such factors as exposure, layout, light, and elevation. Even where there are differences in rents on the Maximum Rent Date for accommodations substantially identical, it could not be the highest rent in a range of such rentals that must be found to be the rent generally prevailing for comparable accommodations.

However, complainant submits that according to the Administrator's prior opinions and holdings, the term, "rent generally prevailing," as used in the Regulation, does not refer to any one particular figure, but covers the entire range of rentals existing on the Maximum Rent Date for comparable accommodations. To support its contention, complainant cites several opinions of the Administrator where there were applications for adjustments requesting increases in rentals over those received on the Maximum Rent Date. The increases sought were for $5 more than the Maximum Rent Date monthly rentals of $85; $6 more than the Maximum Rent Date rentals of $75, $78.50, and $85; $7.50 more than the Maximum Rent Date rentals of $65; $4.50, $6, $6.75, and $10 more than the Maximum Rent Date rentals of $57.50, $70, $78, and $57.50, respectively. In the Matter of Mutual Equities, Inc., II Op. and Dec. OPA (Pike and Fischer) 3290; In the Matter of Granel Realty Co., III Op. and Dec. OPA (Pike and Fischer) 3085; In the Matter of Larchmont Apartments, Inc., III Op. and Dec. OPA (Pike and Fischer) 3070, 3078. Moreover, the maximum rents for the subject units in the foregoing cases fell within a narrow range of rents for comparable units that were virtually identical. All of the applications for upward revision of rents in the foregoing cases were filed under provisions of regulations which permitted such adjustments only where the maximum rent was "substantially" below the rent generally prevailing on the Maximum Rent Date for comparable accommodations. All of the applications in those cases were denied on the ground that the maximum rentals which were being received by the petitioner were

not "substantially" below those generally prevailing for comparable accommodations on the Maximum Rent Date. In certain of the foregoing opinions of the Administrator relied upon by complainant herein, it was stated that the maximum rents for the apartments there under consideration were within a range of rentals paid for comparable accommodations as of the Maximum Rent Date, and, therefore, could not be said to be substantially below those rentals generally prevailing for comparable accommodations at that time. These statements from the opinions of the Administrator are seized upon by complainant as declaring a rule and interpretation that where maximum rents of subject apartments fall within the range of rentals for comparable accommodations on the Maximum Rent Date, they are not higher than "the rent generally prevailing in the Defense-Rental Area for comparable accommodations" on the Maximum Rent Date, within the meaning of the Regulation. This conclusion is entirely erroneous. The Administrator only stated and held in the cited cases that where the maximum rentals fell within the range of rentals paid for comparable accommodations on the Maximum Rent Date, such maximum rental was not *substantially* lower than the rents generally prevailing for comparable accommodations at that time. It is true that in one of his opinions, the Administrator stated that "since the maximum rent * * * is within the rental range for comparable accommodations, it is the opinion of the Administrator that said maximum rent * * * is not lower than the rent generally prevailing for comparable accommodations in the area on March 1, 1943." In the Matter of Granel Realty Co., supra. But a careful reading of the entire opinion discloses that the foregoing was not a decision to the effect that maximum rentals falling within a range of rentals paid for comparable accommodations correspond to the rentals generally prevailing in the area for comparable accommodations on the Maximum Rent Date. The holding and opinion was founded upon the fact that a maximum rent, falling within such a range, was not *substantially* below the rents generally prevailing for comparable accommodations on the

Maximum Rent Date. It is to be noted that the ranges of rentals in the cited cases were very narrow. It may be remarked that we are not here concerned with the question whether maximum rents falling within such a range might not actually be substantially lower than the prevailing rents. Certainly, if there was a variation of 100% between the low and high rentals charged on the Maximum Rent Date for comparable accommodations, a first rent subsequently charged corresponding to the highest or lowest rent in such a range could not necessarily be said to correspond to the rent generally prevailing for comparable accommodations on the Maximum Rent Date. Such first rents could well be substantially higher or lower than the rents generally prevailing. Although the Administrator indicated in his opinions that if the maximum rents fell within the range of rentals charged for comparable accommodations, they could not be said to be substantially below the rents generally prevailing on the Maximum Rent Date, he was in all the cases referred to dealing with a narrow range of rents; and his reference to ranges of rents might well have been restricted to the consideration of such small variations of rent as were in evidence in the cases before him for disposition, in spite of the fact that the broad language which he used might, taken by itself, be construed otherwise. In other words, in speaking of the range of rents, he may have been referring only to the particular range of rents in the matter then before him. Moreover, a review of the facts, as stated in the Administrator's opinions, indicates that his conclusions that the maximum rents there in controversy, were not substantially lower than the rents generally prevailing, were based on most reasonable grounds. These observations merely serve to dispose of complainant's contentions that maximum rents falling within ranges of rentals charged for comparable accommodations can never be said to be higher than the rents generally prevailing for such accommodations on the Maximum Rent Date.

In the proceedings before us, no question arises as to whether the first rents were *substantially* lower than the prevailing

rents; and, accordingly, complainant's citations of the Administrator's opinions and holdings in cases where that point was the principal issue, are here inapplicable.

In this case, the question for determination is whether the evidence supports the Administrator's conclusions that the first rents were higher than the rents generally prevailing in the area for comparable accommodations on the Maximum Rent Date; and that the rentals, as adjusted by the Administrator, resulted in the establishment of maximum rentals corresponding to those generally prevailing in the area for comparable accommodations on the Maximum Rent Date. It is our opinion, as already stated, that the Administrator's conclusions in this regard are supported by substantial evidence.

In accordance with the foregoing, a judgment will be entered dismissing the complaint.